## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02820-RPM

ESTATE OF JOHN THOMAS ROTZIN,
MARY GILCHREST, as personal representative for the estate of John Thomas Rotzin, and
ELENA FUNDUREANU,

      Plaintiffs,

v.

DAVID C. WALCHER, in his official capacity as Arapahoe County Sheriff,
SHERIDAN, COLORADO,
JAMES WIGHTMAN, in his individual capacity,
JOE THOMAS, in his individual capacity,
MATT HOWERTON, in his individual capacity,
BRYAN VALENZUELA, in his individual capacity,
JARED PATTERSON, in his individual capacity, and
GREG MILLER, in his individual capacity,

      Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys, Darold W. Killmer, Mari Newman, and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Second Amended Complaint and Jury Demand as follows:

### INTRODUCTION

1.    Mr. John Thomas Rotzin was a generous and intelligent thirty-three-year-old man who suffered an agonizingly painful death at the hands of deputies of the Arapahoe County Sheriff's Office and officers from the Sheridan Police Department. Mr. Rotzin was a man who suffered from mental illness throughout his adult life resulting in struggles with addiction and periodic incarceration. Just as Mr. Rotzin was turning his life around, with the help of staff and

1

resources at the Arapahoe Community Treatment Center ("ACTC"), he suffered an acute mental breakdown on November 20, 2014. In a measured response to Mr. Rotzin's erratic behavior, staff at ACTC called 911 for assistance from law enforcement officers. When an Arapahoe County Sheriff's Office deputy arrived on scene, he immediately began to escalate the situation, shooting Mr. Rotzin with a taser and delivering multiple electrical blasts to Mr. Rotzin's chest. Shortly thereafter, other Arapahoe County Sheriff's Office deputies and officers from the Sheridan Police Department arrived. Instead de-escalating the situation, these officers and deputies brutally assaulted Mr. Rotzin, who was already restrained and no longer presented any risk of danger or flight, while he cried out for help. Their repeated strikes to Mr. Rotzin's neck, abdomen and legs, coupled with their dogpiling onto Mr. Rotzin, led to Mr. Rotzin suffering cardiac arrest. He would never recover and died in the hospital four days later.

2.      Defendants violated the rights of Mr. Rotzin under the United States Constitution, the Americans with Disabilities Act ("ADA"), and the laws of the State of Colorado, by using force that was unreasonable and unnecessary. Defendants killed Mr. Rotzin. Now, Mr. Rotzin's family seeks justice for their beloved son and husband.

## JURISDICTION AND VENUE

3.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

4.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

5.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

**PARTIES**

6.      At all times relevant to the subject matter of this litigation, the decedent, John Thomas Rotzin, was a citizen of the United States of America and a resident of the State of Colorado.

7.      At all times relevant to the subject matter of this litigation, Plaintiff Mary Gilchrest, the personal representative of the estate of John Thomas Rotzin, was the mother of Mr. Rotzin and was a citizen of the United States. She resided in Colorado when her son was killed, and she is now a resident of the State of Nebraska.

8.      At all times relevant to the subject matter of this litigation, Plaintiff Elena Fundureanu, was the wife of Mr. Rotzin and a resident of the State of Colorado.

9.      Defendant David C. Walcher was acting under color of state law in his capacity as the Sheriff and head of the Arapahoe County Sheriff's Office. Defendant Walcher was responsible for training and supervising all other Arapahoe County Defendants and other employees of the Arapahoe County Sheriff's Office, for setting Sheriff's Office policy, overall management of the Arapahoe County Sheriff's Office, and for insuring the health and welfare of the individuals that Arapahoe County deputies and sergeants interact with on a daily basis.

10.     Defendant Sheridan, Colorado ("Sheridan") is a political subdivision of the State of Colorado and is the public entity responsible for the oversight, supervision, and training of the Sheridan Police Department.

11.     At all times relevant to the subject matter of this litigation, Defendant James Wightman was a citizen of the United States and a resident of Colorado and acting under color of state law in his capacity as a law enforcement officer with the Arapahoe County Sheriff's Office.

12.     At all times relevant to the subject matter of this litigation, Defendant Matt Howerton was a citizen of the United States and a resident of Colorado and acting under color of state law in his capacity as a law enforcement officer with the Arapahoe County Sheriff's Office.

13.     At all times relevant to the subject matter of this litigation, Defendant Joe Thomas was a citizen of the United States and a resident of Colorado and acting under color of state law in his capacity as a law enforcement officer with the Sheridan Police Department.

14.     At all times relevant to the subject matter of this litigation, Defendant Bryan Valenzuela was a citizen of the United States and a resident of Colorado and acting under color of state law in his capacity as a law enforcement officer with the Sheridan Police Department.

15.     At all times relevant to the subject matter of this litigation, Defendant Jared Patterson was a citizen of the United States and a resident of Colorado and acting under color of state law in his capacity as a law enforcement officer with the Sheridan Police Department.

16.     At all times relevant to the subject matter of this litigation, Defendant Greg Miller was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer with the Sheridan Police Department.

## FACTUAL ALLEGATIONS

*Mr. Rotzin was a beloved son, husband, father, and grandson.*

17.     Mr. Rotzin was born to Mary Rotzin Gilchrest in Denver, Colorado. Mary was a young woman when she gave birth to both Mr. Rotzin and previously to his older brother, Darren Rotzin. As a result, all three of them developed a close familial bond.

18.     Mary describes Mr. Rotzin as a loving and kind man with a gentle soul. Even as an adult, he would often wrap his mother up in giant bear hugs. Mr. Rotzin had an incredible sense of humor and was continually making people laugh.

4

19.     From a young age, Mr. Rotzin was continually attempting to learn more about the world to satisfy his curiosity and intelligence. He was especially interested in faith, and over the course of his life he read the Bible multiple times. Mr. Rotzin's interest in the soul and an afterlife was inspired by his grandmother who is a devout Christian and with whom he was extremely close.

20.     Mr. Rotzin was also very close with his grandfather. Mr. Rotzin's grandfather treated him like the son he never had. When Mr. Rotzin was younger, his grandfather would take him out fishing or to a Rockies game every chance that he could.

21.     While growing up Darren Rotzin, Mr. Rotzin's brother, and Mr. Rotzin were best friends. They would do everything together.

22.     In high school, Mr. Rotzin excelled. He always had an inquisitive mind, regularly reading entire textbooks on his own and teaching himself the material. Mr. Rotzin even learned to speak Russian. When his mother asked him why, of all the languages in the world, he had chosen to learn Russian he replied "because it is one of the hardest languages in the world to learn. If I can teach myself to speak Russian then I can teach myself any language."

23.     In 2010, after their grandfather died, Mr. Rotzin and Darren became even closer as they cared for their grandmother. Mr. Rotzin was always the first individual to step up and take care of the family. He was the type of person who would give the shirt off of his back even if he had nothing.

24.     Around the time that they began to care for their grandmother, Mr. Rotzin and Darren moved in together. At this time Darren was married and had a stepchild and a daughter, E.R.

25.     Mr. Rotzin doted on E.R. and treated her as if she was his own daughter, forming a close bond with her.

26.     A few years later, Mr. Rotzin had his own daughter, K.R.

27.     Mr. Rotzin was a happy and proud father and loved K.R. more than anything else in the world. He called K.R. his "little peanut." Though Mr. Rotzin's relationship with K.R.'s mother, Rachel, ended soon after K.R. was born, Mr. Rotzin stayed a part of K.R.'s life and wrote to her frequently when they were apart.

28.     Mr. Rotzin sought custody of K.R. up until his death. What had started out as monitored visits had quickly progressed to regular and overnight visits. Mr. Rotzin would do anything for K.R. and actively proved as much until the day that he died.

29.     Mr. Rotzin was married to Elena Fundureanu. They had a loving relationship and cared for one another deeply. Mr. Rotzin's slide into addiction interrupted their relationship, but they spoke frequently and planned to reunite after his release from Arapahoe County Treatment Center ("ACTC").

***Mr. Rotzin's self-medication of the extreme grief he experienced in the wake of his brother's death led to his placement at ACTC.***

30.     Even after K.R. was born, Mr. Rotzin and Darren continued to live together and had a close and loving relationship. In 2012, when Darren was 33 years old, he was diagnosed with congestive heart failure.

31.     Darren needed a pacemaker; however, he was underinsured and was forced to wait to have the surgery that would save his life. As Darren waited for the pacemaker, he became more and more ill.

32.     Mr. Rotzin would not leave Darren's side throughout this time and took care of Darren in any way that he could. He promised Darren that he would care for E.R. if anything should happen to Darren.

33.     The day after Mr. Rotzin's birthday, Darren and Mr. Rotzin went to the store. Mr. Rotzin went to grab a few items from the convenience store while Darren went into the neighboring grocery store to grab some juice. Mr. Rotzin finished getting his items and sat in the car waiting for Darren.

34.     Mr. Rotzin waited and waited; eventually, an ambulance rushed into the grocery store parking lot. Mr. Rotzin ran into the grocery store but it was too late: Darren had already died.

35.     After Darren's death, Mr. Rotzin was distraught. He could not believe that Darren had not been able to get the surgery that he needed simply because of his insurance. Mr. Rotzin was overcome with grief, anger, and sadness.

36.     In the wake of Darren's death, Mr. Rotzin struggled with depression and other mental health issues.

37.     Mr. Rotzin began self-medicating with drugs and alcohol. His drug use led him to troubles with the law, including incarceration in the Colorado Department of Corrections, after serving his time, he was placed in the Arapahoe Community Treatment Center.

38.     Initially, Mr. Rotzin's placement at ACTC was positive. He was sober and had time to deal with his grief. He realized that he had not been honoring Darren's memory as he should have been. Mr. Rotzin knew that he wanted others to hear Darren's story and he wanted people to know and remember Darren through him.

39.     At ACTC, Mr. Rotzin began to get his life back together. He wrote to his mother frequently and planned to move in with her and his stepfather, David, after he left ACTC. David offered Mr. Rotzin a position at his power washing and window cleaning business which would commence after he left ACTC, and Mr. Rotzin planned to work there so that he could financially provide for E.R. and K.R. David planned to turn the business over to Mr. Rotzin when he retired.

***Mr. Rotzin was given the improper dosage of his psych medications throughout his time at ACTC.***

40.     When Mr. Rotzin was transferred to ACTC from custody of Colorado DOC, he was not given the proper medications or dosages. Mr. Rotzin had previously been prescribed Wellbutrin, to which he had responded positively. Instead, upon entrance to ACTC, he was given Prozac. Mr. Rotzin complained to a fellow resident, Mathew Ortega, that Prozac was causing him psychiatric problems.

41.     The change in medications and dosages had a demonstrable adverse effect on Mr. Rotzin.

***Mr. Rotzin's mental health issues on November 20, 2014 led to the interaction with law enforcement officials from the Arapahoe County Sheriff's Office and Sheridan that caused his death.***

42.     Throughout the day on November 20, 2015, Mr. Rotzin participated in the normal ACTC activities.

43.     At approximately 8:30 p.m., however, Mr. Rotzin was in his room with his roommate Oglesby. Oglesby witnessed Mr. Rotzin experience convulsions and have a seizure, but did not report this seizure to ACTC staff. After having multiple seizures, it became clear that Mr. Rotzin was experiencing a serious mental health episode.

44.     At approximately 9:00 p.m., Mr. Rotzin emerged from his room, which was right off of the dayroom. Mr. Rotzin appeared to be in a trance as he stumbled across the room, bumping into tables and chairs without so much as flinching.

45.     ACTC allows visitors into the facility every day from approximately 7:00 p.m. until 10:00 p.m. Visitors are allowed to interact with residents in the dayroom, which is central to ACTC. Mr. Rotzin's room led directly into this visiting area.

46.     As Mr. Rotzin stumbled across the dayroom in a trance, he reached out and, without seeming to comprehend his actions or even know what he was doing, attempted to hit a visitor in the face, making glancing contact with her. As Mr. Rotzin hit the visitor, he was looking straight ahead and never focused on her. His actions seemed almost involuntary.

47.     After hitting the visitor, Mr. Rotzin continued to walk right past her towards the elevator. The visitor's brother, Christopher Major, an ACTC resident who knew Mr. Rotzin, asked Mr. Rotzin if he had just really "hit his sister" because he was so surprised by Mr. Rotzin's uncharacteristic action. Other individuals in the room saw this happen and jumped up to help the visitor and to attempt to ensure that Mr. Rotzin would not punch her or anyone else again.

48.     Mr. Rotzin, however, in the middle of a serious mental health episode, was not in search of a fight; he was simply in a mental health crisis. The visitor who was punched by Mr. Rotzin would later state that Mr. Rotzin looked like he was not mentally present and "didn't look right."

49.     Mr. Rotzin then proceeded to turn around, come back into the dayroom, and took a swing at another visitor in the same robotic manner. The second visitor's husband, Brion Smith, stood up and punched Mr. Rotzin in the face. Mr. Smith told Mr. Rotzin that he needed to "get [his] shit together."

50.     Mr. Rotzin fell to the floor still in physical contact with Mr. Smith. Other ACTC residents joined in, restraining Mr. Rotzin as he writhed on the floor. Eventually, Mathew Ortega, one of the residents at ACTC and a friend of Mr. Rotzin, jumped in to try and help Mr. Rotzin. As a further illustration of Mr. Rotzin's confused state of mind during this mental health episode, when Mr. Ortega came to Mr. Rotzin's aid, Mr. Rotzin punched his friend Mr. Ortega in the face.

51.     Immediately after Mr. Rotzin punched Mr. Ortega, he apologized and stated that he did not know "what was going on."

52.     Mr. Ortega eventually separated the other residents from Mr. Rotzin and the altercation ended. Mr. Rotzin exited the visiting room and lay down by the laundry room door. Mr. Ortega followed Mr. Rotzin and tried to calm him down.

53.     Mr. Ortega succeeded in keeping Mr. Rotzin calm, even though he was clearly disoriented. As Mr. Ortega sat with Mr. Rotzin, Mr. Rotzin told Ortega "sorry man, I don't know what's wrong with me." Mr. Rotzin eventually went back into his room.

54.     During the altercation in the dayroom involving Mr. Rotzin, the police were called by Kristi Payne, an ACTC employee. After Mr. Rotzin left the dayroom and returned to his room, the dayroom was cleared by Phil Owens, another ACTC employee.

55.     Soon after Mr. Owens had cleared the dayroom, Mr. Rotzin exited his room again and proceeded into the hallway where other ACTC residents were loitering. As he walked past Daniel Edmonson, in a similar fashion to his previous two bizarre attacks on the two female ACTC visitors, he struck Mr. Edmundson. After being hit, Mr. Edmundson physically responded to Mr. Rotzin, again ending the confrontation for the moment.

56.     Soon, Mr. Rotzin again went into the dayroom, where he was immediately apprehended and restrained by multiple ACTC residents and employees. He was dragged toward the doorway in anticipation of the arrival of law enforcement and medical assistance.

57.     Upon information and belief, the call to 911 described Mr. Rotzin as having suffered a severe mental health episode related to his numerous disabilities and each officer knew or should have known that the erratic behavior that led officials at ACTC to call for emergency assistance was a manifestation of Mr. Rotzin's numerous disabilities.

58.     Mr. Rotzin was exhibiting the signs and symptoms of his mental health disabilities, including ADHD, bipolar disorder, anxiety, depression, psychosis, and/or excited delirium, throughout the day on November 20, 2014, and, particularly, throughout his interaction with the named Defendant law enforcement personnel.

***From the moment Arapahoe County deputies arrived on scene, they utilized excessive force against Mr. Rotzin in effectuating his arrest.***

59.     Just as Mr. Rotzin's limp body was being dragged out to the front hallway of ACTC, Deputy Wightman of the Arapahoe County Sheriff's Office arrived on the scene. When Deputy Wightman arrived on scene, multiple ACTC residents informed him that Mr. Rotzin was not behaving normally or rationally.

60.     Mr. Rotzin was seated in the front hallway when Deputy Wightman approached him. Deputy Wightman immediately demanded that Mr. Rotzin stand up but, after having been injured on the previous physical altercations, Mr. Rotzin was unable to do so. Instead, Mr. Rotzin remained seated on the ground, babbling incoherently. It was obvious from Mr. Rotzin's incoherent speech and related behavior that he was suffering from a serious mental health episode.

11

61.     Deputy Wightman again verbally commanded Mr. Rotzin to stand up, though it was clear that Mr. Rotzin did not comprehend the events around him. Eventually, Mr. Rotzin was able to muster the strength to stand up; however, he was still in the throes of a serious mental health episode. In his disoriented state, once he stood up, he started to walk back into ACTC.

62.      Seeing Mr. Rotzin's movement back into ACTC, Deputy Wightman forcefully grabbed Mr. Rotzin by his shirt and slammed him into the wall.

63.     After being slammed into the wall, Mr. Rotzin changed directions and walked, slowly and in a daze, towards Deputy Wightman. Deputy Wightman instructed Mr. Rotzin to face the wall and keep his hands where Deputy Wightman could see them.

64.     Without giving Mr. Rotzin time to comply with his command, Deputy Wightman shot Mr. Rotzin in the chest with his taser.

65.     After this initial taser blast, Mr. Rotzin was stunned and fell to the ground. In intense pain and actual shock, and rendered incapacitated by the taser blast, Mr. Rotzin laid there for multiple seconds.

66.     Disoriented, Mr. Rotzin attempted to stand up. As soon as he saw Mr. Rotzin attempting to stand, Deputy Wightman initiated a second electrical blast from his taser.

67.     After the second electrical blast from Deputy Wightman's taser, Mr. Rotzin was incapacitated. Nevertheless, Deputy Wightman continued to administer a wholly unnecessary and excessive third electrical blast, leaving Mr. Rotzin babbling incoherently and in excruciating pain.

68.     Almost immediately after the third taser blast was delivered by Deputy Wightman, Officer Thomas of the Sheridan Police Department arrived on scene. As Officer

Thomas arrived on scene, Mr. Rotzin continued to speak nonsensically, alerting Officer Thomas (fi he had not already been alerted by dispatch) of Mr. Rotzin's serious disabilities that were causing his erratic behavior.

69.     Officer Thomas wasted no time in subjecting Mr. Rotzin to additional excessive force. Officer Thomas grabbed Mr. Rotzin by the back of his shirt while he was on his stomach on the ground, clearly stunned from the three electrical blasts delivered from Officer Wightman's taser, and forced him into the prone position. Officer Thomas proceeded to place his entire body weight onto Mr. Rotzin's back, while he was in the prone position.

70.     As Officer Thomas crushed Mr. Rotzin's chest cavity, Mr. Rotzin pleaded with the officers, "I'm sorry. I'm sorry. Please stop, I'm dying." Despite these pleas, the officers only continued to escalate their unnecessary and excessive use of force.

71.     While Officer Thomas engaged with Mr. Rotzin, Deputy Wightman continued to administer taser blasts.

72.     As Mr. Rotzin was on the ground and restrained, other officers began to arrive on scene. Deputy Howerton was the first to do so. Deputy Howerton immediately began to assault Mr. Rotzin and delivered at least three knee strikes to Mr. Rotzin's right ribcage. As Deputy Howerton arrived on scene, Mr. Rotzin continued to speak incoherently, plainly indicating his mental health disabilities of Deputy Howerton.

73.     In a natural reaction to the brutal force being applied by the officers, Mr. Rotzin attempted to preserve his life by pulling his arms under his body so as to relieve the pressure being applied to his chest cavity. Being unable to apply handcuffs to Mr. Rotzin, one of the officers repeatedly hit Mr. Rotzin in the back of the head with his baton.

74.     Officer Thomas continued to deliver blows to Mr. Rotzin, even though Mr. Rotzin was on the ground and restrained. Officer Thomas delivered multiple, forceful blows to Mr. Rotzin's left ribcage and neck.

75.     Two other Sheridan officers arrived on scene, Sergeant Miller and Officer Patterson. Mr. Rotzin continued to speak incoherently and nonsensically as Sergeant Miller and Officer Patterson used excessive force; Mr. Rotzin through his speech and behavior exhibited signs and symptoms of his plainly obvious disabilities. They also jumped on top of Mr. Rotzin, further compressing his abdomen and chest cavity with their body weight.

76.     Throughout the officer's use of force, ACTC resident Mr. Ortega stood and watched. He reported seeing one of the officers deploy his baton and strike Mr. Rotzin repeatedly in the back of the head after Mr. Rotzin was already on the ground and restrained by Officer Thomas. Other residents, including Brion Smith, reported seeing Officers Thomas and Deputy Howerton, and other officers, strike Mr. Rotzin repeatedly.

77.     Ortega pleaded with the police to stop using such excessive force on Mr. Rotzin saying repeatedly: "You're going to kill him." In response, one of the officers told Mr. Ortega to "butt out" and threateningly asked him if he "wanted to go to jail too."

78.     Even after Mr. Rotzin was fully handcuffed, the officers and deputy continued to apply force. Officer Howerton, in particular, placed his left knee on Mr. Rotzin's lower back, applying his full body weight to Mr. Rotzin's abdomen.

79.     At one point there were five officers, including Deputy Howerton, Officer Thomas, Deputy Wightman, Sgt. Miller, and Officer Patterson, who were on top of or in physical contact with Mr. Rotzin and applying force to his body. While this deadly force was being applied, Mr. Rotzin was screaming "I'm dying."

80.     From the time the Deputy Howerton arrived on scene until Mr. Rotzin was ultimately transported via ambulance to the hospital, Mr. Rotzin was yelling out things like "Grandma I'm ok"; "Help me"; "I'm sorry"; "Grandma help me;" and "I love mom." Mr. Rotzin also uttered indecipherable sounds and spoke incoherently about seeing colors. If the 911 call, which indicated that Mr. Rotzin was experiencing a serious mental health episode, did not indicate to the officers who arrived on scene that Mr. Rotzin was suffering the effects of a significant mental health episode, these statements clearly indicated to the police on the scene that Mr. Rotzin was experiencing a mental health episode.

81.     The accumulative effects of the multiple stressors caused by the physical brutality inflicted by the law enforcement officers caused a tremendous strain on Mr. Rotzin's body and caused significant pain, anxiety, fear, a sense of impending doom, and, ultimately, as described hereafter, death.

82.     After being beaten, tased, and having five officers apply the entirety of their body weight to this chest cavity, Mr. Rotzin stopped breathing. One of the on-scene deputies yelled out as much. At this point, Officer Thomas radio-ed to dispatch to have an ambulance respond emergent to the scene.

83.     The paramedics arrived shortly after Mr. Rotzin had been severely, willfully, and wantonly assaulted by the officers and while they were still dog-piled on top of him, applying deadly force to his abdomen and chest cavity. The paramedics who arrived on scene recognized immediately that Mr. Rotzin was in dire need of medical help, as a result of the officers' use of lethal force.

84.     While being placed on a stretcher, Mr. Rotzin started speaking incoherently again. He repeated that the paramedics looked like they were wearing water boots, that there were spiders all over him, and that the paramedics looked like pie.

85.     Officer Valenzuela arrived on scene as Mr. Rotzin was being placed onto the paramedic's stretcher.

86.     In clear discomfort while being on the stretcher in handcuffs, Mr. Rotzin was moving around. In response to Mr. Rotzin's obvious discomfort, Officer Valenzuela placed his full body weight on Mr. Rotzin's right shoulder and Deputy Howerton placed his body weight onto Mr. Rotzin, both of them crushing him against the stretcher.

87.     With these two officers placing the entirety of their body weight on Mr. Rotzin, the paramedics administered Versed, to calm Mr. Rotzin.

88.     Approximately one minute later, Mr. Rotzin stopped breathing again and went into cardiac arrest. Only then did the officers remove the handcuffs from Mr. Rotzin's wrists and remove their body weight from him.

89.     The paramedics who had responded to ACTC performed CPR on Mr. Rotzin and continued to do so while he was transported to Swedish Medical Center.

90.     Once at the hospital, Mr. Rotzin was stabilized and placed in the Intensive Care Unit.

91.     Mr. Rotzin never regained consciousness and four days later, on November 24, 2014, Mr. Rotzin died.

92.     After the ambulance left ACTC, some of the Arapahoe County Sheriff's Office officials remained at ACTC to interview individuals and secure the scene. While the police were standing around they were laughing and joking about what had happened. One of the policemen

16

stated to a concerned ACTC resident who had witnessed the fatal, disproportional, and excessive use of force, "[Mr. Rotzin] shouldn't have gotten up."

93.     Defendants' excessive use of force against Mr. Rotzin, discrimination against Mr. Rotzin because of his mental disabilities, failure to reasonably accommodate his disabilities, and failure to intervene to stop the unlawful conduct being committed by others (among other tortious acts) were excessive and caused Mr. Rotzin's death and also caused Mr. Rotzin to experience horrific physical and psychological pain and trauma during the last days of his life.

***Mr. Rotzin was killed by the officers' and deputies' use of excessive force.***

94.     Arapahoe County Coroner Kelly C. Lear-Kaul, M.D., in a report published after Mr. Rotzin died, stated that Mr. Rotzin was killed in a homicide.

95.     The medical examiner's report also stated that Mr. Rotzin's death was caused, in part, by "physical struggle with physical, electrical and chemical restraint." Dr. Lear-Kaul found that Mr. Rotzin's body had evidence of "[b]lunt force injuries of head, trunk and extremities" including "[m]ultiple cutaneous abrasions and contusions" and "[f]ocal mild scalp hemorrhage[.]"

96.     In a report prepared by Dr. Mauke, a physician in the intensive care unit at Swedish Medical Center in Englewood, Colorado, Dr. Mauke indicated that Mr. Rotzin suffered "serious bodily injury" at the hands of the deputies and officers that would likely result in "[a] substantial risk of death[.]"

97.     Specifically, Dr. Mauke indicated that Mr. Rotzin "suffered cardiac arrest due to severe respiratory depression & now is showing minimal signs of neurologic recovery."

98.     The severe respiratory depression had occurred as a result of the officers' use of excessive force.

99.     The coroner's report also found that there were no illegal drugs in Mr. Rotzin's system.

100.     The only drugs in Mr. Rotzin's system were consistent with the prescribed doses of his psychoactive medications prescribed as treatment for his disabilities.

***Third-party witnesses gave statements demonstrating that the officers and deputies who arrived on scene used excessive force in killing Mr. Rotzin.***

101.     One day after the incident, on November 21, 2015, multiple ACTC residents provided written statements of what they had witnessed on November 20, 2014.

102.     Jeremy Michael Lee, a visitor who had helped carry Mr. Rotzin into the hallway where he met his death at the hands of law enforcement, recounted that Mr. Rotzin was incoherent while being dragged into the hallway, continuously asking "what's going on what's happening." He wrote that when Deputy Wightman arrived, he already had his taser drawn and had pointed his taser at Mr. Lee, until Mr. Lee informed the deputy he was not the man for whom the police had been called. Deputy Wightman then ordered Mr. Lee and the others to let Mr. Rotzin go, which they did. Mr. Lee recounted that immediately after Mr. Rotzin was released, Deputy Wightman "shot him with an [sic] taser." As Mr. Lee, and others, yelled at the officers that Mr. Rotzin did "not know what's going on" the officers pulled Mr. Rotzin "out [of] the door[,] beating him and shoting [sic] him over and over with tasers." Mr. Lee recounted seeing "a police officer get out the case a [sic] dive on top of his body with an elbow." Mr. Lee reported that Mr. Rotzin "was walking talking and alive before the police got here I seen the police beat the man bad real bad and two days later I learned that the man was dead." Ultimately, Mr. Lee opined that "the police officer on the seen [sic] killed him and should be held accountable."

103.     Mathew Ortega wrote in a statement that "[o]nce the police arrived they told [Mr. Rotzin] to stand up once he did they tazed [sic] him." Ortega recounted that the police

handcuffed Mr. Rotzin "and continued to taze [sic] him 4 times more" and that the deputies and officers "punched [Mr. Rotzin] numerous times, while an Arapahoe officer was kneeing and kicking [Mr. Rotzin]." Mr. Ortega stated that "[Mr. Rotzin] was begging them to stop saying 'I'm sorry I love you I'm sorry I love you.'"

104.    Another resident wrote that Mr. Rotzin was "pulled to the front door where he meet [sic] the police and was tasered and put in hand cuffs. The police was punching and kicking him then tasered him like 3 more times. He didn't resisted [sic] and was still getting tasered and beat up for for [sic] like 10 more minutes."

105.    Yet another resident recounted seeing "the police brutally kneeing the client in the ribs three times and then heard the tazer [sic] go off once the client started screaming saying 'I'm done please stop.' After he said that I then again heard the tazer [sic] go off again once. He was still screaming begging the police to stop but they continued to brutally assault him. After I seen [sic] that I couldn't stand the fact that the police kept on assaulting the client so I went outside."

***Each officer witnessed other officer(s) engage in excessive force and took no action to intervene.***

106.    Deputy Wightman saw the actions of Deputy Howerton, Officer Thomas, Sergeant Miller, Officer Patterson, and Officer Valenzuela described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

107.    Officer Thomas saw the actions of Deputy Howerton, Deputy Wightman, Sergeant Miller, Officer Patterson, and Officer Valenzuela described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

108.     Deputy Howerton saw the actions of Deputy Wightman, Officer Thomas, Sergeant Miller, Officer Patterson, and Officer Valenzuela described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

109.     Sergeant Miller saw the actions of Deputy Wightman, Officer Thomas, Deputy Howerton, Officer Patterson, and Officer Valenzuela described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

110.     Officer Patterson saw the actions of Deputy Wightman, Officer Thomas, Deputy Howerton, Sergeant Miller, and Officer Valenzuela described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

111.     Officer Valenzuela saw the actions of Deputy Howerton described in detail *supra* which constituted excessive force and took no action to intervene to prevent the further use of excessive force.

***Footage from the only camera that would have captured Mr. Rotzin's interaction with the deputies and officers on November 20, 2014 was not preserved.***

112.     The video from the camera at ACTC in the front hallway, which would have captured the use of force in its entirety, was either lost, destroyed, or otherwise not preserved. All of the other cameras at ACTC did capture video of the incident, but Mr. Rotzin's interaction with the officers and deputies in the front hallway cannot be seen on any of these videos.

***Defendant Sheridan's systematic failure to hold its law enforcement officers accountable for violating the law – the Sheridan Police Department ratifies its officers' conduct.***

113.     Commander Runco and Sergeant Cape, of the Sheridan Police Department, prepared a Use of Force report on November 23, 2014 in review of the use of force by Sheridan Officers Thomas, Patterson, and Valenzuela against Mr. Rotzin on November 20, 2014.

114.    In the report, the Sheridan Police Department found that the use of force against Mr. Rotzin on November 20, 2014, by Officers Thomas, Patterson, and Valenzuela "was conducted in accordance" with the Sheridan Police Department's policies and practices. In other words, Officers Thomas, Patterson, and Valenzuela did not violate Sheridan Police Department policy and practice in using the force that caused Mr. Rotzin's death.

115.    Defendant Sheridan, to this day, has not taken any disciplinary action against Officers Thomas, Patterson, and Valenzuela for their use of force against Mr. Rotzin on November 20, 2014.

116.    Defendant Sheridan has conceded that the conduct of its law enforcement officers, as described herein, was taken pursuant to its customs, policies, and practices, consistent with its training and official direction.

117.    Additionally, Sheridan has failed to change the way it trains its law enforcement officers in response to the incident leading to Mr. Rotzin's death despite the clear and significant deficiencies in its training regimen underscored by Mr. Rotzin's unlawful and wholly preventable killing.

***The Arapahoe County Sheriff's Office's systematic failure to hold its law enforcement officers accountable for violating the law – the Arapahoe County Sheriff's Office ratifies its deputies' conduct and the District Attorney's decision not to prosecute anyone for killing Mr. Rotzin.***

118.    Lieutenants Palmer and Thompson of the Arapahoe County Sheriff's Office, conducted a Use of Force Report on January 20, 2015, into the use of force against Mr. Rotzin by Arapahoe County Sheriff's Office deputies on November 20, 2014.

119.    In their report, they concluded, on behalf of the Arapahoe County Sheriff's Office, that no further investigation was required into the use of force against Mr. Rotzin by the Arapahoe County Sheriff's Office deputies on November 20, 2014.

120.    This conclusion was reached by the Arapahoe County Sheriff's Office on the basis that every action taken by the deputies during the use of force against Mr. Rotzin on November 20, 2014, was in accordance with the policies, practice, and training of the Arapahoe County Sheriff's Office.

121.    On January 28, 2015, the Arapahoe County Sheriff's Office re-opened the inquiry into whether the use of force against Mr. Rotzin was in accordance with the policies of the Arapahoe County Sheriff's Office. A lieutenant completed the review and concluded the Use of Force did not require further investigation because there were no violations of Arapahoe County Sheriff's Office policies by the deputies in their use of force on Mr. Rotzin.

122.    Arapahoe County District Attorney ("DA") George H. Brauchler formally chose not to criminally prosecute anyone for the killing of Mr. Rotzin in a decision statement dated March 24, 2015, written by Chief Deputy District Attorney Clinton McKinzie. The DA's analysis supporting this decision was demonstratively biased towards the involved law enforcement officers. The decision is emblematic of Arapahoe County's longstanding refusal to effectively, fairly, and objectively police its own law enforcement officers.

123.    Arapahoe County has failed to discipline any of the Defendants who participated in the incident leading to Mr. Rotzin's death for their conduct during that incident despite being fully aware of their willful and wanton violations of state and federal law.

***Deficiencies in Defendant Sheridan's training caused Mr. Rotzin's death.***

124.    Sheridan's longstanding training and supervising deficiencies are exemplified by the following subject areas, among others: the failure to utilize regular stress inoculation training (which foreseeably leads to officers becoming over-adrenalized during stressful situations and overreacting to any actual or perceived resistance/noncompliance); the failure to teach appropriate de-escalation tactics (such as the use of words in lieu of force to defuse potentially

volatile situations); the failure to train and require officers to timely, accurately, or truthfully report their on-the-job conduct (which foreseeably causes officers to lie about their conduct and the conduct of their fellow officers without being held accountable); the failure to require its officers to preserve evidence relating to allegations of misconduct (which foreseeably enables officers to evade accountability for their wrongdoing); and the failure to appropriately discipline officers who engage in misconduct (which foreseeably emboldens officers to violate the law).

125.    In addition, for years before the incident that led to Mr. Rotzin's death, Sheridan failed to properly train its officers how to properly respond to mentally disabled detainees, like Mr. Rotzin. Sheridan has persisted in its deliberate indifference to the rights of disabled persons on the streets even though it is certain law enforcement officials will regularly interact with mentally disabled persons as part of their employment.

126.    Sheridan's training defects relating to its deputies' interactions with mentally ill individuals include but are not limited to: the failure to properly train its deputies regarding interaction with people suffering from mental health issues; the failure to provide (at least) most of its deputies with adequate, effective, and appropriate Crisis Intervention Training (CIT); the failure of Sheridan to properly train its deputies to request assistance from a mental health professional or other specialized mental health training when responding to individuals experiencing mental health crises; the failure of Sheridan to properly train its deputies to assume a non-threatening manner when interacting with individuals experiencing mental health crises who do not present an immediate, clear and present danger; the failure of Sheridan to properly train its deputes to move slowly in an effort not to agitate individuals experiencing mental health crises who do not present an immediate, clear and present danger; the failure of Sheridan to properly train its deputes to use the passage of time to defuse the situation when interacting with

individuals experiencing mental health crises who do not present an immediate, clear and present

danger; and the failure of Sheridan to properly train its deputes to attempt to use words, not

physical force, to de-escalate situations involving individuals experiencing mental health crises.

127.    These deficiencies in training, supervision, and discipline were the result of

Defendant Sheridan's conscious and deliberate choice, and were the moving force behind the

injuries inflicted on Mr. Rotzin by Sheridan law enforcement.

***Deficiencies in the Arapahoe County Sheriff's Office's supervision and training caused Mr. Rotzin's death.***

128.    The Arapahoe County Sheriff's Office has intentionally and willfully failed to

change the way it supervises and trains its law enforcement officers in response to the incident

leading to Mr. Rotzin's death despite the clear and significant deficiencies in its training regimen

underscored by Mr. Rotzin's unlawful and wholly preventable killing.

129.    The Arapahoe County Sheriff's Office's longstanding training deficiencies are

exemplified by the following subject areas, among others: the failure to utilize regular stress

inoculation training (which foreseeably leads to officers becoming over-adrenalized during

stressful situations and grossly overreacting to any actual or perceived

resistance/noncompliance); the failure to teach appropriate de-escalation tactics (such as the use

of words in lieu of force to defuse potentially volatile situations); the failure to train and require

officers to timely, accurately, or truthfully report their on-the-job conduct (which foreseeably

causes officers to lie about their conduct and the conduct of their fellow officers without being

held accountable); the failure to require its officers to preserve evidence relating to allegations of

misconduct (which foreseeably enables officers to evade accountability for their wrongdoing);

and the failure to appropriately discipline officers who engage in misconduct (which foreseeably

emboldens officers to violate the law).

130.     In addition, for years before the incident that led to Mr. Rotzin's death, the Arapahoe County Sheriff's Office failed to properly train its deputies how to properly respond to mentally disabled detainees, like Mr. Rotzin. The Arapahoe County Sheriff's Office has persisted in its deliberate indifferent to the rights of disabled persons and on the streets even though it is certain law enforcement officials will regularly interact with mentally disabled persons as part of their employment.

131.     The Arapahoe County Sheriff's Office's training defects relating to its deputies' interactions with mentally ill individuals include but are not limited to: the failure to properly train its deputies regarding interaction with people suffering from mental health issues; the failure to provide (at least) most of its deputies with adequate, effective, and appropriate Crisis Intervention Training (CIT); the failure of the County to properly train its deputes to request assistance from a mental health professional or other specialized mental health training when responding to individuals experiencing mental health crises; the failure of the Sheriff's Office to properly train its deputies to assume a non-threatening manner when interacting with individuals experiencing mental health crises who do not present an immediate, clear and present danger; the failure of the Sheriff's Office to properly train its deputes to move slowly in an effort not to agitate individuals experiencing mental health crises who do not present an immediate, clear and present danger; the failure of the Sheriff's Office to properly train its deputes to use the passage of time to defuse the situation when interacting with individuals experiencing mental health crises who do not present an immediate, clear and present danger; and the failure of the Sheriff's Office to properly train its deputes to attempt to use words, not physical force, to de-escalate situations involving individuals experiencing mental health crises.

132.    These deficiencies in training, supervision, and discipline were the result of The Arapahoe County Sheriff's Office's conscious and deliberate choice, and the moving force behind the injuries inflicted on Mr. Rotzin by Arapahoe County law enforcement.

The Arapahoe County Sheriff's Office***'s extensive custom, pattern, and practice of excessive force***

133.    Mr. Rotzin's death at the hands of Arapahoe County law enforcement officers is a tragic example of the overwhelmingly common use of excessive force by law enforcement officers throughout Arapahoe County and within the Arapahoe County Sheriff's Office.

134.    The Arapahoe County Sheriff's Office has created, fostered, tolerated, and perpetuated an environment and culture of law enforcement brutality to the constitutional and statutory rights of citizens and residents. It was foreseeable and virtually inevitable that a tragic incident like the one involving Mr. Rotzin would happen under the circumstances.

***Despite warning from Taser International about the dangerous effects of delivering electrical blasts to victims' chests, Mr. Rotzin was tased in the chest in accordance with the customs, policies, and practices of the Arapahoe County Sheriff's Office .***

135.    On October 15, 2009, Taser International issued a training bulletin to all law enforcement agencies. The bulletin advised law enforcement officials that they should not shoot tasers at a suspect's chest, because of the risk of an adverse cardiac event.

136.    The Arapahoe County Sheriff's Office intentionally does not train its deputies to not shoot suspects in the chest with their tasers.

137.    Despite this explicit warning from Taser International, Deputy Wightman deployed his taser into Mr. Rotzin's chest and delivered at least three electrical blasts to his chest.

138.     The Arapahoe County Sheriff's Office is and has customarily been deliberately indifferent to the Constitutional rights with whom its law enforcement officers interact in its supervision, training, and use of tasers and other uses of force.

139.     The electrical blasts to Mr. Rotzin's chest by Deputy Wightman's taser, and The Arapahoe County Sheriff's Office's lack of training on when and where to properly deploy a taser to prevent an adverse cardiac event (the lack of which caused Deputy Wightman to deploy his taser into Mr. Rotzin's chest), wholly or in part, caused Mr. Rotzin's death or serious bodily injury, pain, and suffering.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – 4th Amendment Violation – Excessive Force
### (Against Defendants David Walcher, City of Sheridan, Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller)

140.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if set for the herein.

141.     Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller, at all relevant times hereto, were acting under the color of state law in their capacities as law enforcement officers for the City of Sheridan or the Arapahoe County Sheriff's Office.

142.     At the time of Mr. Rotzin's death, Mr. Rotzin had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

143.     Any reasonable law enforcement officer knew or should have known of this clearly establish right at the time of Mr. Rotzin's death.

144.     Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller engaged in the use of force that was objectively unreasonable in light of the facts and

27

circumstances confronting them, violating Mr. Rotzin's clearly established Fourth Amendment rights.

145.    Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller unreasonably and excessively used deadly and other force against Mr. Rotzin, resulting in his death.

146.    None of the Defendants took reasonable steps to protect Mr. Rotzin from the objectively unreasonable use of force of the other Defendant officers, despite being in a position to do so.  Each is therefore liable for the damages resulting from the objectively unreasonable force used by the others.

147.    The acts or omissions of Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller were the moving force behind and proximate cause of Mr. Rotzin's injuries and death.

***Defendants David Walcher, in his official capacity, and City of Sheridan are municipally liable for the violation of Mr. Rotzin's Fourth Amendment rights***.

148.    The acts and omissions of Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller were engaged in pursuant to the custom, policy, and practice of the City of Sheridan and/or David Walcher, as head of the Arapahoe County Sheriff's Office , which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers in the City and/or Sheriff's Office.

149.    Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, failed to properly train and supervise their employees to avoid the use of excessive force and to reasonably accommodate (and not discriminate against) disabled persons.

150.    Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, knew, or should have known, that their employees would use excessive force

and fail to reasonably accommodate (and discriminate against) disabled persons, violating citizens' rights under the circumstances present in this matter.

151.    Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, were deliberately indifferent to the constitutional and statutory rights of members of the community, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Rotzin) by failing to properly train and supervise its or her employees.  Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

152.    Defendants City of Sheridan's and David Walcher's, as head of the Arapahoe County Sheriff's Office, policies, customs, or practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violation to Mr. Rotzin's rights.

153.    The custom, policy, and practice of the City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, of encouraging, condoning, tolerating, and ratifying the use of excessive force by law enforcement officers, as described herein, were the moving force behind and proximate cause of the violation to Mr. Rotzin's constitutional rights.

154.    The acts or omissions of Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, caused Mr. Rotzin damages in that he suffered extreme physical and mental pain during the assault that resulted in his death.

155.    The actions of Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, as described herein deprived Mr. Rotzin of the rights, privileges, liberties, and immunities secured by the Constitution and laws of the United States of America, and caused him other damages.

156.     The acts or omissions of Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, Miller, City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, caused Mr. Rotzin damages in that he suffered extreme physical and mental pain during the assault that resulted in his death.

### SECOND CLAIM FOR RELIEF
**42 U.S.C. § 12132, *et seq.* – Violation of Americans with Disabilities Act of 1990, as Amended**
**Unlawful Discrimination and Failure to Reasonably Accommodate**
**(Against Defendants David Walcher, in his official capacity as head of the Arapahoe County Sheriff's Office, and City of Sheridan)**

157.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

158.     At all relevant times, Mr. Rotzin was a person with a disability, had a record of a disability, or was regarded as having a disability by Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan. Mr. Rotzin's anxiety, depression, delusions, excited delirium, ADHD, and/or bipolar disorder, substantially limited a variety of major life activities, including but not limited to mentally processing current events, thinking, concentrating, comprehending, sleeping, and effectively coping with anxiety and stress.

159.     The City of Sheridan and the David Walcher, as head of the Arapahoe County Sheriff's Office, are public entities as that term is used in Title II of the ADA.

160.     Mr. Rotzin was qualified to participate in the services, programs, activities, and benefits provided to citizens of the City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, within the meaning of Title II of the ADA.

161.     Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan ailed to reasonably accommodate Mr. Rotzin's disabilities despite knowing that he suffered from a number of disabilities, including his a anxiety, depression, delusions, excited

delirium, ADHD, and/or bipolar disorder, perceived the manifestations of Mr. Rotzin's disabilities as noncompliance with their orders and treated him worse because of their misperceptions, failed to train their officers how to properly interact with those who suffer from mental health disabilities leading to the mistreatment of Mr. Rotzin. This violated clearly established law under Title II of the ADA and its implementing regulations.

162.     Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan had no legitimate basis for violating Mr. Rotzin's rights conferred by the ADA.

163.     The actions of Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan were objectively unreasonable in light of the circumstances confronting them.

164.     Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan engaged in these actions intentionally, willfully, and wantonly.

165.     Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, failed (and continues to fail) to properly train, supervise and/or discipline their employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities.

166.     This inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office.

167.     In light of the duties and responsibilities of Defendant City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, personnel, the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of

appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant City of Sheridan and County of Arapahoe are liable for their failure to properly train, supervise, and/or discipline its subordinate employees and agents.

168.    Such failure to properly train and supervise was the moving force behind and proximate cause of the violations of Plaintiffs' federally-protected rights described herein, and constitutes an unconstitutional policy, procedure, custom and/or practice.

169.    Plaintiffs have been and continue to be damaged by Defendants David Walcher, as head of the Arapahoe County Sheriff's Offic,e and City of Sheridan's unlawful conduct under the ADA.

170.    The acts or omissions of Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan, including the unlawful policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiffs' damages.

**THIRD CLAIM FOR RELIEF**
**29 U.S.C. § 701,** *et seq.* **– Violation of the Rehabilitation Act of 1973, as Amended**
**Unlawful Discrimination**
**(Against Defendants David Walcher, in his official capacity as head of the Arapahoe County Sheriff's Office, and City of Sheridan)**

171.    Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein.

172.    At all times relevant to this Complaint, Mr. Rotzin's anxiety, depression, and delusions and other impairments and disabilities substantially limited a variety of major life activities, including but not limited to mentally processing current events, thinking, concentrating, comprehending, sleeping, and effectively coping with anxiety and stress.

173.    Mr. Rotzin is an individual with a handicap or disability within the meaning of the Rehabilitation Act of 1973.

174.    Mr. Rotzin was qualified to participate in the services, programs, activities, and benefits provided to citizens of the City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, within the meaning of the Rehabilitation Act of 1973.

175.    Defendants City of Sheridan and David Walcher, as head of the Arapahoe County Sheriff's Office, and their programs and activities receive – and have received at all times relevant to this Complaint – federal financial assistance as that term is used in 29 U.S.C. § 794.

176.    Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan have excluded Mr. Rotzin from participation in, denied him the benefits of, and subjected him to discrimination in programs and activities solely by reason of his disability in violation of 29 U.S.C. § 794 and its implementing regulations.

177.    Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan are liable for the acts and/or omissions of their agents and employees. Defendants, either directly or by and through agents, discriminated against Mr. Rotzin on the basis of his disability, record of having a disability, or being perceived as having a disability.

178.    In violating the Rehabilitation Act, Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan acted intentionally, maliciously, and/or with reckless and/or deliberate indifference to Plaintiffs' federally protected rights.

179.    As a consequence of the illegal conduct of Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan, Plaintiffs have sustained and continue to sustain significant damages.

180.    The conduct of Defendants David Walcher, as head of the Arapahoe County Sheriff's Office, and City of Sheridan was the proximate cause of Plaintiffs' injuries, damages, and losses.

### FOURTH CLAIM FOR RELIEF
### State Law Claim for Wrongful Death under C.R.S. § 13-21-202
### (Plaintiff Elena Fundureanu Against Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller)

181.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

182.    Plaintiff Elena Fundureanu, as the wife of Mr. Rotzin, suffered and continues to suffer economic and non-economic damages due to Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller conduct toward her husband, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they may have reasonably expected to receive from her husband had he lived, and non-economic damages for grief, loss of their husband's companionship, impairment in the quality of her life, inconvenience, pain and suffering, and extreme emotional stress.

183.    Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller's conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences to Mr. Rotzin or his family.

184.    Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

185.    Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller's conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, in that their

conduct, individually and in concert with one another, caused the death of Mr. Rotzin and that the Defendants (1) consciously disregarded (2) a substantial and (3) unjustifiable risk that he or she would (4) cause the death of another, namely, Mr. Rotzin and such that there shall be no statutory limitation on damages available herein to Plaintiff.

**FIFTH CLAIM FOR RELIEF**
**Survival Action**
**(Plaintiff Estate of John Thomas Rotzin Against Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller)**

186.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

187.    Plaintiffs Mary Gilchrest and Elena Fundureanu are among the heirs and personal representatives of the Estate of John Rotzin.

188.    As a result of the deliberate indifference, reckless indifference and/or negligence of Defendants Wightman, Thomas, Howerton, Valenzuela, Patterson, and Miller as more fully described above, the Estate of John Thomas Rotzin has suffered injuries and damages, including, but not limited to loss of medical expenses, funeral expenses, and punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

(a)  Appropriate relief at law and equity;

(b)  Declaratory relief and other appropriate equitable relief;

(c)  Economic losses on all claims as allowed by law;

(d)  Compensatory and consequential damages, including damages for emotional and physical distress, humiliation, loss of enjoyment of life, loss of companionship

and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate;

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 9th day of January 2018.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*

_____
Darold W. Killmer
Mari Newman
Andy McNulty
Killmer Lane & Newman, LLP
1543 Champa St., Ste. 400
Denver, CO  80202
(303) 571-1000
dkillmer@kln-law.com
mnewman@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiffs*

## CERIFICATE OF SERVICE

I hereby certify that on January 9, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Writer Mott
Erin L. Powers
Arapahoe County Attorney's Office
5334 S. Prince St.
Littleton, CO 80120-1136
(303) 795-4639
WMott@arapahoegov.com
epowers@arapahoegov.com

*Counsel for Defendants Walcher, Howerton, and Wightman*

Eric M. Ziporin
Rachel Wachs
SENTER GOLDFARB & RICE, LLC
3900 E. Mexico Avenue, Suite 700
Denver, Colorado 80210
303-320-0509 phone
303-320-0210 fax
eziporin@sgrllc.com
rwachs@sgrllc.com

*Counsel for Defendants Thomas, Valenzuela, Patterson, and Miller*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

_____
Jesse Askeland